SCHLOTTMAN v. E. I. DU PONT DE NEMOURS POWDER CO.

(District Court, S. D. New York. December 22, 1913.)

1. CONTRACTS (§ 220*)—IMPLIED TERMS—ACTION FOR BREACH.

During the pendency of a deal for the purchase by defendant of the stock of a competing fuse manufacturing company defendant promised in writing that if the deal was made, and if after defendant had owned the property for a year it was able to make fuse and powder in the plant at a stated cost, it would pay the seller $25,000 in addition to the price to be named in the contract. The contract was made and performed by the seller. Held, that such agreement was based on a valuable consideration, and impliedly bound defendant to keep the property for at least a year, and to make a fair effort to produce fuse and powder at the cost named, and that its failure to use the plant for that purpose, and its sale within the year to be used for other purposes, constituted a breach of the agreement.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1013; Dec. Dig. § 220.*]

2. CONTRACTS (§ 324*)—REMEDIES FOR BREACH—MEASURE OF DAMAGES.

Where defendant, in a contract for the purchase of property, agreed to pay an additional consideration named, contingent on certain events the happening of which was made impossible by the wrongful acts of defendant, the seller is not limited to an action to recover such stated sum, but may maintain a suit on a quantum valebat, to recover the actual value of the property above the consideration received.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1549-1557; Dec. Dig. § 324.*]

3. TRIAL (§ 177*)—DIRECTION OF VERDICT—EFFECT OF REQUESTS BY BOTH PARTIES.

Where at the close of the evidence both parties request a directed verdict, if there is any question of fact, it is for the court to decide.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 400; Dec. Dig. § 177.*]

At Law. Action by William H. Schlottman against the E. I. Du Pont de Nemours Powder Company. On motion by defendant to set aside the verdict and for new trial. Denied.

Kellogg & Rose, L. Laflin Kellogg, and Abram J. Rose, all of New York City, for plaintiff.

Townsend, Avery & Button, William H. Button, and F. H. Button, all of New York City, and J. P. Laffey, of Wilmington, Del., for defendant.

RAY, District Judge. On the 24th day of July, 1908, one Charles G. Grubb of the city of Pittsburgh, Pa., and the defendant here, E. I. Du Pont de Nemours Powder Company, entered into a written agreement of which the following is a copy:

"This agreement, made the 24 day of July, 1908, between Chas. G. Grubb of the city of Pittsburg, Pennsylvania, party of the first part and E. I. du Pont de Nemours Powder Company, a corporation of the state of New Jersey, having its principal office in the city of Wilmington, Delaware, party of the second part: Whereas, the party of the second part is desirous of purchasing the stock of the Pittsburgh Fuse Manufacturing Company, and whereas, the Pittsburgh Fuse Manufacturing Company is a corporation of the state of Pennsylvania, having an authorized capital stock of seventy-five thousand

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

($75,000) dollars, divided into seven thousand five hundred (7,500) shares of the par value of ten ($10) dollars each, all of which stock is now issued and outstanding and is full paid and nonassessable, and said company owns and operates a manufacturing plant, situate at Callery, Butler county, Pennsylvania, located on a farm containing about (80) acres, and which is and has been operated as a plant for the manufacture of commercial fuse: Now this agreement witnesseth, that the party of the first part, in consideration of the payments hereinafter mentioned, agree to sell, assign, transfer and set over unto the party of the second part, within ten days from the date of this agreement, all of the capital stock of the Pittsburgh Fuse Manufacturing Company.

"The parties of the first part agree that when said stock shall be transferred by them, the real estate and plant of the Pittsburgh Fuse Manufacturing Company shall be free from all mortgages, judgments, and other encumbrances, except a lease for oil and gas purposes held by the South Penn Oil Company, under which lease two wells are now in operation, and the party of the first part agrees that the royalties from said wells shall be assigned to such persons as may be indicated by the party of the second part, and that all accounts and bills and debts of every kind will be paid.

"The party of the first part agrees that the party of the second part may, within five (5) days from the date of this agreement, send to the plant of the Pittsburgh Fuse Manufacturing Company, one or two representatives, whose names shall be satisfactory to the parties of the first part, which persons shall have the right to inspect said plant, under the supervision and direction of the first party, but said persons will not be permitted to approach the fuse machine within a distance of six (6) or seven (7) feet. If the report of such persons is satisfactory to the party of the second part, it will notify the party of the first part to that effect within fifteen (15) days after such inspection, and shall also notify the parties of the first part within the same period of time if said report is not satisfactory, in which case this agreement shall be null and void, and all rights of the parties hereunder shall cease and determine.

"The parties of the first part agree that at the time of the delivery by them of the stock of the Pittsburgh Fuse Manufacturing Company, they will turn over and deliver to the party of the second part, all originals, tracings, blue prints and specifications, including those showing each part of the fuse and tape machines, as operated at the plant of the Pittsburgh Fuse Manufacturing Company, and also drawings showing the construction of said machines, together with all books, stock ledger and minute book of the company.

"It is understood that all open accounts, all notes and moneys due or in bank, on books of the Pittsburgh Fuse Manufacturing Company shall be assigned, transferred and delivered by said company to the party of the first part, or to whoever he may nominate.

"In consideration thereof, the party of the second part agrees to pay to the parties of the first part the sum of one hundred fifty thousand ($150,000) dollars, payable as follows: Seven hundred and fifty (750) shares of the par value of one hundred ($100) dollars each of the preferred stock of the party of the second part and seven hundred and fifty (750) shares of the par value of one hundred ($100) dollars each of the common stock of the party of the second part, making a total par value of said stock of one hundred fifty thousand ($150,000) dollars.

"Chas. G. Grubb agrees to deliver resignations of all officers and directors to take effect when desired, who will agree to act until resignations are accepted.

"In witness whereof, the party of the first part has hereunto set his hand and seal, and the party of the second part has caused these presents to be signed by its president, and its corporate seal to be hereunto affixed, duly attested by its secretary, the day and year first above written."

The Pittsburgh Fuse Manufacturing Company was or had been engaged in the manufacture and sale of commercial fuse. The defendant here, the purchasing company, was interested in the same busi-

ness. On the 20th day of July, 1908, and while negotiations were pending between Grubb and the Du Pont Company, so called for brevity, the president of the defendant company, T. C. Du Pont, as an inducement to the said Grubb to make such sale and enter into such agreement, wrote and delivered to Grubb the following:

"Mr. Chas. G. Grubb, Building.—Dear Sir: Should the deal now under discussion for the Pittsburgh Fuse Mfg. Co. go through and after we have had the property a year, it is understood that if in my judgment the property has for any reason been worth $175,000 to our company and we manufactured double tape fuse at $2.00 per thousand with powder $3.60 per keg, we are to pay you $25,000 in either bonds, preferred or common stock of our company as we may elect.

"Yours truly,                         "T. C. Du Pont, President."

July 20, 1908, T. C. Du Pont also wrote Grubb the following:

"Mr. Chas. G. Grubb, Building—Dear Sir: Referring to agreement of even date, we agree to buy from you or from those whom you may designate, $10,-000 worth of either preferred or common stock of E. I. du Pont de Nemours Powder Co. as we may elect at eighty.

"This offer to be left open fifteen days from date of transfer.

"Yours truly,                         "T. C. Du Pont, President."

Thereupon and thereafter Grubb fully complied with the terms of the agreement dated July 24, 1908, and the property was transferred and delivered to the defendant. The defendant company turned the plant of the Pittsburgh Fuse Manufacturing Company over to W. B. Lewis, who ran it a short time. It kept the plant a few months only, and then transferred it to the Ensign-Bickford Company for the sum of $150,723.22, the $723.22 representing some added raw material. The defendant company took possession of this plant July 30, 1908, and turned it over to the Ensign-Bickford Company February 5, 1909. It was dismantled and its use discontinued. In short the defendant company put it out of its power to make double tape fuse or powder, or cause it to be done in this plant; did not make any, or cause any to be made, and refused to pay the $25,000 or any sum. August 19, 1909, Grubb assigned his claim and cause of action to this plaintiff, Schlottman.

[1] The defendant contends that the communications of July 20, 1908, in connection with the agreement in writing of July 24, 1908, imposed no obligation on the Du Pont Company, and asserts that it expresses no consideration. It is of course necessary to go outside of that letter and show just what the "deal now under consideration for the Fuse Mfg. Co." mentioned or referred to therein was. However, it refers to a deal now under consideration for the purchase of that property, and identifies the property and contains an implied promise that the Du Pont Company will keep it a year or more if necessary and manufacture double tape fuse therein and powder, and that, if it is able to make such fuse at $2 per thousand and powder at $3.60 per keg, and if in the judgment of the president of that company the property has for any reason been worth $175,000 to it, that then the Du Pont Company will pay Grubb an additional compensation or consideration for such property of $25,000 in either bonds, or preferred or common stock of that company. This was a valid promise, based

on a good and a valuable consideration, viz., the making and execution and performance by Grubb of the deal then under consideration by which Grubb was to transfer the Pittsburgh Fuse Manufacturing Company property or stock to the defendant company, the E. I. Du Pont de Nemours Powder Company.  There is nothing illegal, or immoral, or indefinite or uncertain, in the agreement.  If Grubb will sell and dispose of his property to the Du Pont Company for a certain consideration, then in consideration thereof the Du Pont Company will keep that property at least a year, put it to a test in manufacturing fuse and powder, and if able to make such articles at a certain cost in the plant purchased, will pay Grubb the $25,000 in the bonds or stock mentioned.  It was an undertaking capable of performance.  Whether the Du Pont Company could make fuse and powder at the cost mentioned was not known, and is not now known, but it could have been determined by the defendant and known.  The company did nothing to ascertain whether or not it could be done, made no effort to perform its agreement with Grubb, but, on the other hand, voluntarily disabled itself to perform, put it out of its power to perform, or determine whether fuse and powder could be made in that plant at the prices named.  Horton v. Clark Mfg. Co., 94 App. Div. 404, 88 N. Y. Supp. 73; Pritchard v. McLeod (C. C. A.) 205 Fed. 24; Wells v. Alexandre, 130 N. Y. 642, 29 N. E. 142, 15 L. R. A. 218; Wilson v. Mechanical Orguinette Co., 170 N. Y. 542, 63 N. E. 550; Hearn v. Stevens & Bros., 111 App. Div. 101, 97 N. Y. Supp. 566.

In Wells v. Alexandre, supra, Wells proposed to furnish defendants coal for its two steamers named for the year 1888, at a price per ton and Alexandre & Sons accepted the offer.  Coal was delivered for a time, when Alexandre & Sons, the defendants *sold their steamers* and refused to take more coal.  Held that this sale of the steamers was immaterial, and did not relieve defendants from the obligation to take the coal required in the ordinary and accustomed use of the steamers for the year.

In Wilson v. Orguinette Co., supra, the owner of patents granted an exclusive license, and the licensee was to pay certain royalties on all articles sold by it.  The licensee transferred the license to a corporation formed by the consolidation of itself and another corporation, and discontinued business.  Held that defendant, the licensee, was still liable for royalties to the same extent it would have been had it continued business.

In Horten et al. v. Hall & Clark Mfg. Co., defendant applied to plaintiff to become its agent in selling cotton wadding, which it was about to manufacture.  Plaintiffs agreed to take the business, and did for 1899.  January 2, 1900, the defendant's president called on the plaintiff and expressed satisfaction, and said plaintiff should have the business for 1900 on the same terms, and that they would not sell out (the business).  The plaintiff accepted the offer.  Defendant sold out and discontinued business, and plaintiff sued for damages.  The court said, citing cases:

"We think it clear that in making this contract there was an implied agreement on the part of the defendant to continue manufacturing throughout the

year, and that in suspending manufacture and transferring its business it was guilty of a breach of its contract."

In Hearn v. Stevens & Bro., 111 App. Div. 101, 97 N. Y. Supp. 566, it was held:

"A contract of employment for a fixed time, which gives to the plaintiff certain commissions on the sales of 'cloaks and suits now known as Department Nos. 21 and 18,' entitled such plaintiff to commissions on cloaks and suits which at the time of contract were sold in these departments, but which during the term of the contract were transferred by the defendant to other departments. Such contract must be interpreted in view of the conditions existing at the time of contract. A plaintiff is not precluded from asserting his rights under such contract by not objecting to the transfer of portions of said goods to other departments."

In Pritchard v. McLeod (C. C. A.) 205 Fed. 24, it was held:

"Where the balance of the purchase price of certain mining claims was payable only out of the gross output of the claims, defendant could not escape performance by willfully neglecting to work the claims and produce the fund from which the payments were to be made, though there was no clause in the agreement binding him to do so.

"Where a contract for the sale of mining claims provided that the purchaser should pay a balance of the price only by application of 25 per cent. of the gross output of the claims, it was his duty to use reasonable diligence to create the fund by working the mines, and his failure to do so for more than four years was sufficient to raise a rebuttable presumption of breach.

"Where a contract for the sale of mining claims provided that a balance of the price should be paid out of the proceeds of the mines, it would be presumed that the claims contained mineral; and the burden was on the defendants to rebut such presumption, and show that they were barren in defense, if such was the fact."

It cannot be doubted that when the defendant company induced Grubb to part with his property as he did, on the promise that if it made fuse and powder at the prices named it would pay the $25,000 additional compensation, it impliedly promised to keep the property for at least a year, and make a fair effort to make fuse and powder at the cost named. Otherwise the promise in that communication was meaningless.

### Damages.

[2] The plaintiff here has not sued to recover the $25,000 falling due under the terms of the contract and according to its terms, but has sued to recover as damages for the breach the actual value of the property, less payments made thereon. If suit had been brought for the $25,000 agreed to be paid according to the terms of the agreement, then it would have been incumbent on the plaintiff to prove that the premises or property transferred were reasonably worth $175,000, and that fuse and powder could be made therein at the prices named. These were conditions precedent to recovery of that sum as the fixed consideration. Hopedale, etc., v. Electric, etc., 132 App. Div. 348, 116 N. Y. Supp. 859, affirmed 198 N. Y. 588, 92 N. E. 1086. But the absence of such proof does not preclude the recovery of damages for the breach of the agreement, such damages as the plaintiff has proved.

Here the defendant by its own wrongful acts made the performance of the conditions impossible. In Humaston v. Telegraph Co., 87 U. S. (20 Wall.) 20, 22 L. Ed. 279, it is held:

"When a person on a given contract covenants to pay a sum whose amount is to be contingent on certain events and is to be ascertained by arbitrators, such person, if he prevent an arbitration, may be sued at law on a quantum valebat, and the sum due may be ascertained by a jury under instructions from the court."

Here the *amount* to be paid was not to be contingent on certain events, but the payment of a *fixed sum* was contingent on certain events the happening of which were made impossible by the wrong of the defendant. Hence suit may be maintained on a quantum valebat; that is, for what the property was worth. Defendant by its acts not only deprived Grubb of the right to have a test made which would determine the value of the property in the judgment of the president of the Du Pont Company, and one which would determine whether fuse and powder could be made at the cost named, but by its wrongful act in violating the contract, also put it out of its own power to make the tests and determine the value of such property in the judgment of its president, and whether or not fuse and powder could be made at the cost specified, all of which it had agreed to do. In the opinion of this court, this plaintiff, the assignee of Grubb, cannot be relegated to proof that the president of the defendant company should have been satisfied the property was worth $175,000, and that fuse and powder could have been made at the cost named in the agreement in order to recover. There was abundant evidence that the value of the property transferred by Grubb was at least $150,000; and, as the value of the property transferred to him was proved to be $122,625 on a quantum valebat, the plaintiff was entitled to a verdict of $27,375. The amended complaint, prior to the trial, alleged that the property sold and delivered was of the fair and reasonable value of $175,000, and by the defendant's wrongful acts in depriving said Grubb of the opportunity to have a test made of the property as provided in said contract the said Grubb was damaged in the amount of the difference between the fair and reasonable value of said stock, i. e., the sum of $175,000, and the amount paid by the defendant on account of the purchase thereof under said contract; i. e., the sum of $150,000, viz., the sum of $25,-000.

On the trial to conform to the facts and proof the plaintiff was permitted to change the amount alleged to have been received from $150,-000 to $120,000. I think this must be treated as an action to recover damages for the breach of the contract, and not one on the contract to recover the sum agreed to be paid.

[3] It was claimed on the trial that Grubb assented to the sale of the property made by the Du Pont Company to the Ensign-Bickford Company, and so was estopped to claim any damages. The facts on that subject with the correspondence subsequent to the breach of the contract do not sustain such contention. At the close of the evidence both parties requested the court to direct a verdict in its favor, thus conceding there was no question of fact for the jury. For this reason the court did not submit the question of the value of the plant, etc., to the jury. Under the well-settled rules if there was any question of fact it was for the court to decide.

There will be an order denying the motion for an order setting aside the verdict and granting a new trial.